LYNN M. HANSEN, ESQ.
Nevada State Bar No. 244
JIMMERSON HANSEN, P.C.
415 South Sixth Street, Suite 100
Las Vegas, Nevada 89101
Tel: (702) 388-7171
Fax: (702) 380-6406
lmh@jimmersonhansen.com
Attorneys for Defendant
UNIVERSITY MEDICAL CENTER
OF SOUTHERN NEVADA;
KATHLEEN SILVER; BRUCE L. WOODBURY,
TOM COLLINS, CHIP MAXFIELD,
LAWRENCE WEEKLY, CHRIS
GIUNCHIGLIANI, SUSAN BRAGER,
and RORY REID, Clark County Commissioners;
ex-officio, the Board of Trustees of UNIVERSITY
MEDICAL CENTER OF SOUTHERN NEVADA

## UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| JAMES S. TATE, M.D.,<br><br>Plaintiff,<br><br>vs.<br><br>UNIVERSITY MEDICAL CENTER OF SOUTHERN NEVADA, a political subdivision of Clark County, State of Nevada; BRUCE L. WOODBURY, TOM COLLINS, CHIP MAXFIELD, LAWRENCE WEEKLY CHRIS GIUNCHIGLIANI, SUSAN BRAGER, and RORY REID, Clark County Commissioners; ex-officio, the Board of Trustees of UNIVERSITY MEDICAL CENTER OF SOUTHERN NEVADA; KATHLEEN SILVER, an individual; THE MEDICAL AND DENTAL STAFF OF THE UNIVERSITY MEDICAL CENTER OF SOUTHERN NEVADA, an independent subdivision of University Medical Center of Southern Nevada; JOHN ELLERTON, M.D. an individual; JOHN FILDES, M.D., an individual; DOE Defendants I through X, inclusive; and ROE CORPORATIONS A through Z, inclusive,<br><br>Defendants. | CASE NO.:2:08-cv-01183-LDG-GWF<br><br>**DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT** |

-1- UMC\Tate\Pleadings\Opp to Plaintiff's Motion For Partial Summary Judgment

COME NOW, Defendants UNIVERSITY MEDICAL CENTER (hereinafter "UMC"), BRUCE L. WOODBURY, TOM COLLINS, CHIP MAXFIELD, LAWRENCE WEEKLY CHRIS GIUNCHIGLIANI, SUSAN BRAGER, and RORY REID, Clark County Commissioners; ex-officio, the Board of Trustees of UNIVERSITY MEDICAL CENTER OF SOUTHERN NEVADA (hereinafter "Defendant Commissioners") and KATHLEEN SILVER, an individual, by and through their attorney of record, Lynn M. Hansen, Esq., of the law firm of Jimmerson Hansen, and do hereby join in DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT.

## POINTS AND AUTHORITIES

### I.

### STATEMENT OF FACTS

This case arises out of an altercation that occurred on August 2, 2008, between the Plaintiff and the family members of a minor child. Dr. Tate was the on-call trauma surgeon on August 2, 2008, when he treated a 14 year-old boy who had sustained road rash injuries. He was discharged and instructed to return for care at the UMC outpatient Burn Unit. When the patient and family arrived, they told the nurse that they did not want Dr. Tate to treat the boy. (See: UMC Dept. of Public Safety Report, Statement of Nurse Cathy Downey, attached hereto as Exhibit "A", bate numbers 16-17.)

Dr. Tate walked into the treatment area where the patient and his family were waiting to see a doctor. Dr. Tate and the patient's father began arguing about the patient's treatment. Dr. Tate walked out of the treatment area and the patient's father followed yelling at him. Dr. Tate turned and said, "go ___ your ___ mother." (See: Exhibit "A", bate numbers 10-11, and Kenneth Allgood's deposition, page 32, line 25, attached hereto as Exhibit "B".) Notably, Dr. Tate claims he only said, "your momma," but the witness statements consistently state that he used obscenities. (See: Exhibit "A" bate numbers 2, 7, 10, 12, 13, 15, 17, and Exhibit "B", page 33, lines 24-25 and page 33, lines 4-7. There is consensus among witnesses statements that Dr. Tate did use a derogatory term

1   when referring to the grandmother and the investigating officer found these witnesses to
2   be credible. (See: Exhibit "A" bate numbers 2, 7, 10, 12, 13, 15, 17 and Kenneth Allgood's
3   Affidavit, attached hereto as Exhibit "C".)

4         The patient's father and Dr. Tate continued to argue. The boy's grandmother tried
5   to get between the two men to break up the fight, when Dr. Tate took his finger and poked
6   the woman in the chest. (See: Deposition of Todd Miller, Page 13, lines 6-7 and 18-19,
7   attached hereto as Exhibit "D".)  The red mark on the grandmother's chest was observed
8   by Public Safety Officer, Kenneth Allgood. (See: Exhibit "B", page 13, lines 17-18, page
9   14, lines 8-16, page 15, line 15 and  Exhibit "C", line 17). A nurse then stepped in between
10  the grandmother and Dr. Tate, and told Dr. Tate to leave the area.  UMC security was
11  called and they investigated the incident. A photograph was taken of the red mark left on
12  the grandmother's chest. (See: Exhibit "A", bate # 9). Witness statements were also taken
13  and included in the UMC Dept. of Public in Safety report. (See: Exhibit "A", bate numbers
14  6-17).  When interviewed about the incident, Dr. Tate was "defensive and evasive." (See:
15  Exhibit "C", page 19, lines 3-8).

16        The incident was investigated and reported to the CEO of UMC, Kathleen Silver.
17  In a letter dated August 8, 2008, Ms. Silver requested that Dr. John Fildes, Chief of the
18  Trauma Department, remove Dr. Tate from the Trauma Department call schedule, "to limit
19  any further incidents during the investigation of Dr. Tate, and to minimize the chance that
20  he will pose an unreasonable danger to UMC patients, visitors, employees and Medical
21  staff." (See: Kathleen Silver letter, attached hereto as Exhibit "E").  Dr. Fildes then
22  removed Dr. Tate from the trauma on-call schedule and his agreement to provide on-call
23  trauma services to the hospital was terminated. (See:  Trauma Surgery Agreement
24  ("TSA"), attached hereto as Exhibit "F"). Dr. Tate's hospital privileges were never affected
25  and he maintained his trauma and surgery privileges as well as his access to the surgery
26  on call schedule. (See: Kathleen Silver Deposition, attached hereto as Exhibit "G", page
27  12, lines 3-12, page 45, lines 21-25, page 46, lines 1-9, page 48, lines 1-8.
28  ///

-3- UMC\Tate\Pleadings\Opp to Plaintiff's Motion For Partial Summary Judgment

## II.

## LEGAL ARGUMENT

### A.   STANDARD OF REVIEW

The Plaintiff has brought the underlying Motion For Partial Summary Judgment, asking the Court to summarily decide the disputed claims, where there are material issues of fact in question. Summary judgment is only proper when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). An issue is "genuine" when there is a sufficient evidentiary basis on which a reasonable fact finder could find for the nonmoving party, and a dispute is "material" if it could affect the outcome of the suit under the governing law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 2510 (1986).

The party moving for summary judgment has the burden of showing the absence of a genuine issue of material fact. Id. at 256-57, 2514. The court must view all the evidence in the light most favorable to the nonmoving party. County of Tuolome v. Sonora Cmty. Hosp., 236 F.3d 1148, 1154 (9th Cir. 2001). In response to a properly submitted summary judgment motion, the burden shifts to the opposing party to set forth specific facts showing that there is a genuine issue for trial. Henderson v. City of Simi Valley, 305 F.3d 1052, 1055-56 (9th Cir. 2002). The nonmoving party "may not rely on denials in the pleadings but must produce specific evidence, through affidavits or admissible discovery material, to show that the dispute exists." Bhan v. NME Hosps., Inc., 929 F.2d 1404, 1409 (9th Cir. 1991).

A court "generally cannot grant summary judgment based on its assessment of the credibility of the evidence presented." Agosto v. INS, 436 U.S. 748, 756, 98 S.Ct. 2081, 2087 (1978). "[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Anderson, 477 U.S. at 249, 106 S.Ct. at 2511.

### B. PLAINTIFF WAS NOT ENTITLED TO DUE PROCESS PROTECTION

To prove a claim under 42 U.S.C. § 1983, Plaintiff must allege violation of rights secured by the Constitution and laws of United States, and must show the alleged deprivation was committed by a person acting under color of state law. 42 U.S.C.A. § 1983. Further, the protections of due process only attach where there is a deprivation of a protected property or liberty interest. Nev. Const. art. 1, § 8, cl. 5. In this case, the Plaintiff cannot demonstrate a protected right.

In examining a procedural due process question, the court will initially ask whether there exists a liberty or property interest which has been interfered with by the state; and second, the court will look at whether those "procedures attendant upon that deprivation were constitutionally sufficient." Ky. Dep't of Corr. v. Thompson, 490 U.S. 454, 460, 109 S.Ct.1904, 1908 (1989) (citing Board of Regents of State Colleges v. Roth, 408 U.S. 564, 571, 92 S.Ct. 2701, 2709 (1972); and Hewitt v. Helms, 459 U.S. 460, 472, 103 S.Ct. 864, 868 (1983)).

Protected interests "may arise from two sources- the Due Process Clause itself and the laws of the states." Hewitt v. Helms, 459 U.S., at 466, 103 S.Ct., at 868. For purposes of procedural due process, "a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must instead, have a legitimate claim of entitlement to it." Board of Regents of State Colleges v. Roth, 408 U.S., at 577, 571, 92 S.Ct., at 2709. Property interests "are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law." Id.

Plaintiff claims he has property rights in being on the on-call trauma schedule at UMC and that rights were also created by contracts, explicit and implied, with UMC. Plaintiff claims that his rights were violated because he was removed from the on-call schedule without a due process hearing. However, Plaintiff's Due Process rights were not violated, because being on the trauma on-call schedule is not a property right requiring a

-5- <sub>UMC\Tate\Pleadings\Opp to Plaintiff's Motion For Partial Summary Judgment</sub>

due process hearing.

### 1. Plaintiff's Due Process Rights Have Not Been Affected Because Access to the On-Call Trauma Schedule is Not a Protected Property Right.

Plaintiff claims that inclusion in an on-call trauma schedule is a "property right" entitling Plaintiff to due process protection. Plaintiff bases this assertion on a claim that removal from the on-call trauma schedule amounted to a reduction or termination of medical staff privileges. Plaintiff also claims that a property interest was created by contractual agreements with the hospital.

Plaintiff improperly cites Moore v. Bd. of Trustees of Carson-Tahoe Hosp., 88 Nev. 207, 495 P.2d 605 (Nev. 1972), in support of his position that access to the on-call trauma schedule is a protected interest. However, this case does not support this position as it only addressed medical staff privileges at a hospital, not an on-call trauma schedule.

In Moore, Dr. Moore's medical staff privileges were terminated for inappropriate behavior. 88 Nev. 207, 495 P.2d 605 (1972). Dr. Moore received a hearing prior to termination of his privileges. In that case, there was no due process claim, but rather, Dr. Moore challenged the termination of his medical staff privileges on the basis that the acts of which he was found guilty, were not specifically proscribed in the bylaws. The Nevada Supreme Court upheld the termination of the hospital staff privileges and stated, "the right to enjoy medical staff privileges in a community hospital is not an absolute right, but rather is subject to reasonable rules and regulations of the hospital." Id. at 608.

The Moore case is particularly helpful to the Defendants. It states that "hospitals and their governing bodies may be held liable for injury resulting from imprudent or careless supervision of members of their medical staff." Id. In the instant case, the decision of who provides on-call trauma services is well within the purview of hospitals, which pay for those services. In this case, a licensed physician acted as a bully, inappropriately touching a patient's family member. There was a prior incident of

inappropriate behavior.[1] Those facts lead the administrator of the hospital and the leaders of the Trauma Center to have concerns as to whether the hospital should subject trauma patients and their families to the type of behavior in which Dr. Tate engaged. (See: Exhibit G, page 64, lines 5-9, page 65, lines 17-18, page 66, lines 5-22).

In Engelstad v. Virginia Municipal Hosp., a doctor with hospital staff privileges was terminated from his position as director of pathology. 718 F.2d 262 (8th Cir 1983). The doctor brought suit against the hospital claiming the hospital and the hospital commission violated his constitutional rights by terminating him from his position without a hearing. The doctor argued that termination of his director's position had the practical effect of making his staff privileges meaningless and therefore his staff privileges had been reduced or terminated, triggering procedural requirements. The court disagreed.

The court stated, "Dr. Engelstad's staff privileges guaranteed him only the authority, not the wherewithal, to practice his profession. His authority to practice his profession at the hospital has not been reduced or terminated, but remains intact." Id. at. 268. The 8th Circuit upheld the lower court's ruling that the doctor failed to show a constitutionally protected property interest in his continued employment. The court stated that for the doctor to have a due process property interest in his director's position, he must identify some "rule or mutually explicit understanding supporting a legitimate claim of entitlement to his continued employment." Id. at 265. This is the same argument made by Dr. Tate. He claimed his being paid to see trauma patients from being on the trauma call schedule is a property right, yet it is no different than Dr. Engelstad's position that his employment was a right. These two cases are really the same assertion and the Court should make the same finding, being on trauma calls is not a protected property right.

Notably, at least one other jurisdiction has held that access to on-call trauma privileges are not hospital privileges which rise to the level of constitutionally protected

---

[1] According to an article in the Review Journal, dated February 19, 2009, Dr. Tate was involved in a altercation at a Radio Shack store on September 20, 2003. The event was captured on a security tape and shows Dr. Tate punching a woman in the back of the head.

-7- UMC\Tate\Pleadings\Opp to Plaintiff's Motion For Partial Summary Judgment

property interests under Due Process. See: <u>Rafiy v. Nassau County Medical Center,</u> 218 F. Supp 2d 295 (E.D. New York 2002).

In <u>Rafiy</u>, Plaintiff doctors were a father and son who were licensed physicians specializing in orthopedic surgery. These doctors had hospital medical privileges and also were on the on-call schedule for the emergency room and orthopedic clinics. The father, Pierre, was removed from the on-call schedule shortly after an argument with the Chairman of the Department of Orthopedics at the Hospital. Later the son was removed from the on-call schedule after a dispute with the same Chairman of the Department. However, neither doctor was prohibited from practicing medicine at the hospital. The plaintiffs' complaint alleged that Defendant "deprived them of on-call and clinic privileges 'without a hearing despite the fact that such a hearing is required.'" <u>Id.</u> at 302. Defendant relied on the fact that on-call and clinic schedules are not hospital privileges under state law. The court agreed, finding that, although state law did not define what constituted hospital privileges, since a physician's hospital privileges are limited to particular types of procedures and practices, and not particular schedules, there was no recognized property interest violation.

In <u>Hanna v. Board of Trustees of N.Y. University Hospital</u>, 243 A.D.2d 362 (NYAD1997) a physician commenced action for removal from his position as Chief of Pediatric Urology. The court held that this was not a reduction of his privileges. He was still allowed to admit and treat patients which is what privileges are. If the Plaintiff's argument was correct, then the hospital controls privileging. That is not right. This action was taken by the CEO and Trauma Chief. Privileges are granted by the medical staff operating through the Medical Executive Committee ("MEC".) Clearly, Dr. Tate can still admit and treat patients at UMC. He was only removed from the on-call schedule which is financed by the hospital. The fact that Plaintiff has failed to produce any evidence that access to the on-call trauma schedule should be afforded the same due process protections speaks volumes regarding the lack of merit in the argument.

The Plaintiff attached a privilege checklist with his motion that allowed Dr. Tate to provide trauma services. Those privileges are still in effect. There is no restriction in his trauma privileges. The only change is he is not paid by the hospital to take trauma call. (See: Exhibit "G" at page 45, lines 6-7).

The trauma department is different from other parts of the hospital. A trauma patient does not usually select the trauma surgeon. Admitted patients who enter the hospital for elective surgery do. "The patients often times in trauma have no ability to have any opinion or any option about who takes care of them." (See: Exhibit "G" at page 19, lines 7-9).

In addition, trauma patients are especially fragile due to the circumstances of having a traumatic injury. Defendant Kathleen Silver clearly understood this concern. In her deposition testimony, Ms. Silver explained, "Because in a traumatic– in a trauma, emotions run very high. Things are very unpredictable. And I think it causes a different state of mind for the patient, for the doctor, and for the – for the family." (See: Exhibit "G" at page 22, lines 6-10). This was her rationale for removing Dr. Tate, based on his behavior. Trauma patients do not select their treating physician due to the urgency and extent of their injuries. (See: Exhibit "G" at page 19, lines 5-9). Ms. Silver did not want to subject them to a potentially abusive physician. However, she understood that Dr. Tate could continue to admit patients that voluntarily elected to have him as their physician.

If Dr. Tate cannot manage his behavior, it potentially places trauma patients at risk. Defendant Silver felt that removal of Dr. Tate from caring for such patients was necessary to protect the hospital.

Thus, it is clear that access to the on-call trauma schedule is not a property right that should be afforded due process protection. Therefore, summary judgment must be denied as to this issue.

**2.   Plaintiff Does Not Have a Protected Contractual Right in Continued On-Call Status**

Plaintiff claims that the Trauma Surgery Agreement, Medical Staff Bylaws and Disruptive Physician Policy create an express employment contract and that Plaintiff also

has an implied contract for access to the on-call trauma schedule entitling him to the protection of procedural due process. Plaintiff's reliance on these claims is misplaced.

The Trauma Surgeons Agreement (attached hereto as Exhibit "F") is a compensation schedule. It does not confer a right to the trauma on-call schedule. It does not specify any amount of access to the on-call schedule and does not provide for a hearing upon termination. Further, it may be terminated by either party without cause.

The University Medical Center of Southern Nevada Medical and Dental Staff Bylaws (hereinafter called "Bylaws" attached hereto as Exhibit "H") govern the actions of the Medical Staff. The Bylaws do not govern University Medical Center or it Administrators. It sets forth a scheme for dealing with complaints against physicians. Procedural rights, that is, hearing and appellate reviews, are required in an action deemed to be "Adverse Actions." Article XII(A)(1)(a) of the Bylaws, defines Adverse Actions as the following:

(1) Denial of initial staff appointment;
(2) Denial or reappointment;
(3) Suspension of staff membership;
(4) Revocation of staff membership;
(5) Denial of requested appointment to or advancement in staff category;
(6) Reduction in staff category;
(7) Suspension or limitation of the right to admit patients or of any other membership prerogative directly related to the Physician's, Dentist's or Podiatrist's provision of patient care;
(8) Denial of requested department affiliation;
(9) Denial or restriction of requested clinical privileges;
(10) Reduction in clinical privileges;
(11) Suspension of clinical privileges;
(12) Revocation of clinical privileges;
(13) Individual application of, or individual changes in, mandatory consultation requirement.

The Disruptive Physician Policy (attached hereto as Exhibit "I") incorporates the "Adverse Actions" section of the Bylaws.

Plaintiff relies on the Trauma Surgeons Agreement, the Bylaws and The Disruptive Physician Policy in making the argument that the trauma on-call schedule is a property right. The Bylaws and The Disruptive Physician Policy provide for a hearing in the event of revocation of hospital staff privileges. Plaintiff's assertion that the Bylaws are implicated

-10- UMC\Tate\Pleadings\Opp to Plaintiff's Motion For Partial Summary Judgment

here and that they create a contractual right is misplaced, because the action taken by Defendants was not an Adverse Action as to his hospital privileges. The Adverse Actions section of the Bylaws refers to action to be taken by the MEC regarding medical staff privileges. The Bylaws are not implicated here because Dr. Tate's medical staff privileges remain intact.

At issue here was an administrative decision to remove Dr. Tate from the on-call trauma schedule. Had an "Adverse Action" been taken by the MEC regarding Dr. Tate's Medical Staff Privileges, he may have been entitled to a hearing.

In addition, Plaintiff's assertion of an implied contract is in error. Plaintiff relies on the Perry v. Sindermann, for the assertion that Dr. Tate had an implied contract for continued access to the on-call trauma schedule. 408 U.S.593, 92 S.Ct 2694 (1972). In Perry, the Board of Regents declined to renew the contract of a junior college professor, without explanation and without hearing. In that case, the teacher offered evidence of the Faculty guide which stated,

> " Teacher tenure: Odessa College has no tenure system. The Administration of the College wishes the faculty member to feel that he has permanent tenure as long as his teaching services are satisfactory and as long as he displays a cooperative attitude toward his co-workers and his superiors, and as long as he is happy in his work." Id. at 600.

The teacher also claimed legitimate reliance on guidelines of the Coordinating Board of the Texas College and University System that provided that a person, who had been employed as a teacher in the state college and university system for seven years or more, has some for of job tenure. Id.

Plaintiff asserts that since Dr. Tate has been on the on-call trauma schedule in the past, that this created an implied contract for continued employment. In Englestad, the doctor claimed that he had a protected interest in his position as the director of pathology at the hospital. 718 F.2d 262 (8th Cir.). In that case, the court cited Perry v. Sindermann, stating " he must identify some rule or mutually explicit understanding supporting a

-11 UMC\Tate\Pleadings\Opp to Plaintiff's Motion For Partial Summary Judgment

legitimate claim of entitlement of his continued employment as director and that he may invoke a hearing." Id. at 265. The court said, "all we have here is Dr. Englestad's unilateral expectation, based largely on notions of professional courtesy and decency, that he would be presented with just cause for his termination." Id. at 266.

Plaintiff has not submitted any evidence other than the fact that Dr. Tate has been on the on-call trauma schedule in the past, to support his contention that an expectation of continued employment is anything other than a "unilateral expectation of courtesy."

Further, even if there was a contract between the hospital and Dr. Tate, as CEO of the hospital, Defendant Kathleen Silver has the authority to cancel a contract which would "effectively remove a physician, not necessarily from the medical staff but from the contracted duties provided for by that contract." (See: Deposition Testimony of Kathleen Silver (Chudacoff v. UMC portion of the deposition) page 59, lines 20-24, attached hereto as Exhibit "J"). Therefore, as applicable here, any contract that UMC may have had with Dr. Tate for on-call trauma services, was terminable.

Plaintiff has failed to show a protected interest in the on-call trauma list. Thus, he was not deprived of due process rights. Plaintiff has failed to show that he has a property interest, therefore, summary judgment should be denied.

**B.    DEFENDANTS DID NOT VIOLATE THE SHERMAN ANTI TRUST ACTS**

Plaintiff argues that Defendants have violated Sections 1 and 2 of the Sherman Antitrust Act. The Sherman Act prohibits conspiracies 'in restraint of trade or commerce among the several states." 15 U.S.C. Section 1, and also prohibits monopolizing "any part of the trade or commerce among the several states." 15 U.S.C. 2.5. Section 4 of the Clayton Act, 15 U.S.C. 15 (a), grants a right of action to "any person who shall be injured in his business or property by reasons of anything forbidden in the antitrust laws."

**1)    Section 1 of Sherman Anti Trust Act**

"By it's terms, section one of the Sherman Act prohibits "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade." 15 U.S.C. Sec. 1

(1982). The Supreme Court, however, has long recognized that section one was intended to prohibit only those restraints that **unreasonably restrain competition**. <u>Oltz v. St. Peter's Comm. Hosp.</u>, 861 F.2d 1440, 1445 (9th Cir. 1988) (*emphasis added*). Only a Plaintiff who has suffered an antitrust injury, ie., an injury of the type that antitrust laws were intended to protect against may sue." <u>Bhan v. NME Hosps. Inc.</u>, 669 F. Supp 998, 1012 (E.D.CA 1987).

> To prove a violation of section one of the Sherman Act, 15 U.S.C. 1, Plaintiff must show:
>
> i) an agreement or conspiracy among two or more persons or distinct entities;
> ii) by which the persons or entities **intend** to harm or restrain competition; and;
> iii) which **actually injures** competition the existence of an agreement in the form of a contract, combination, or conspiracy that imposes. <u>Oltz,</u> 861F.2d, at 1445 (emphasis added).

If the claimant can prove that a conspiracy harmed competition, the fact finder must balance the restraint and any justification or pro-competitive effects of the restraint. <u>Id.</u>

Whether conduct "unreasonably restrains competition is ordinarily determined under a "rule of reason" analysis, in which a fact finder will weigh all circumstances of the case. <u>Id.</u> There are some categories of restraints that are so manifestly anti-competitive in nature that they are "illegal per se." <u>Id</u>. The Supreme Court and the Ninth Circuit have applied the per se rule to four types of agreements; horizontal and vertical price fixing, horizontal market division, group boycotts or concerted refusals to deal, and tying arrangements. <u>Bhan v. NME Hosps. Inc.</u>, 669 F. Supp 998, 1017(E.D CA 1987). Each of these analyses will be addressed below.

      **a)   Per Se Analysis**

Although the analysis of whether conduct "unreasonably restrains competition" is ordinarily determined under a "rule of reason" analysis, in which a fact finder will weigh all circumstances of the case, Plaintiff makes a creative argument that a Per Se Analysis is applicable in this case in order to avoid facing the question of whether any restraint on trade was unreasonable. Plaintiff argues that removal of Dr. Tate from the on-call trauma

schedule amounts to a "group boycott." Plaintiff lists three factors involved in proving a group boycott:

    i) cuts off access to supply, facility or market necessary to enable the victim to compete;
    ii) boycotting firm possesses dominant market position; and
    iii) practices are not justified by plausible arguments that they enhanced overall efficiency of competition.

Dr. Tate's access to the market has not been cut off by his removal from the on-call trauma schedule. Dr. Tate was removed from the on-call trauma schedule only. He still maintains medical staff privileges at the hospital, he was never removed from the surgery call schedule and additionally he is still a licensed physician who can work at any hospital or within his private practice. Dr. Tate's market has not been "cut off" by Defendants. Dr. Tate could work at the Sunrise Trauma Center located in Las Vegas, Nevada.[2] Sunrise Trauma Center is a Level II center.

The only difference between a Level I trauma center and a Level II trauma center is the level of research the facility is engaged in. (See: Exhibit "G" at page 52, lines 12-15; page 53-54, lines 23-25, 1-2). Plaintiff relies extensively on the fact that UMC has the only level I trauma center in the region. However, since the only difference between a Level I and a Level II is the amount of research, this lends absolutely no support to Plaintiff's claims.

Finally, Plaintiff claims the Defendant's "boycott" is "not justified by plausible arguments that they enhanced overall efficiency or competition." The acts of the hospital in removing Dr. Tate from the on-call trauma schedule, after an altercation with a patient's family are completely justified in "enhancing overall efficiency" of the hospital. Given the heightened emotions and stress that are present in a trauma situation, removal from the on-

---

[2] Notably, Dr. Tate claims that he has not been able to work at another trauma center and as evidence has attached a three-line cover letter submitted to another hospital inquiring about employment. Dr. Tate claims that he never received a response, and there is no indication that he ever followed up on the letter or even inquired as to whether it reached its intended recipient.

-14- UMC\Tate\Pleadings\Opp to Plaintiff's Motion For Partial Summary Judgment

call schedule, was a justifiable administrative decision, based solely on Dr. Tate's conduct.

Clearly Plaintiff does not meet the standards of a group boycott and therefore the removal of Dr. Tate from the on-call trauma schedule cannot be said to be a "per se" unreasonable restraint of trade.

### b) Rule of Reason Analysis

In the alternative, Plaintiff asks the court to conduct a rule of reason analysis to determine whether Defendant's removal of Dr. Tate from the on-call trauma schedule is an unreasonable restraint on trade. This analysis involves three components:

    i)   persons or entities to the agreement intend to harm or restrain competition;
    ii)  an actual injury to competition occurs;
    iii) the restraint is unreasonable as determined by balancing the restraint and any justification or procompetitive effects (Oltz, 861 F.2d, at 1445).

Plaintiff has the burden of showing the Defendants' action caused injury to competition. Jefferson Parish Hosp. Dist. No. 2 v. Hyde, 466 U.S. 2, 29, 104 S.Ct. 1551. (1984). Injury to the antitrust plaintiff is insufficient to prove injury to competition. A Plaintiff must prove that competition in the relevant market has been harmed in some way. Bhan, 669 F. Supp, at 1021.

It is a great stretch to believe that Defendants actually intended to harm or restrain competition by removing Dr. Tate from the on-call trauma schedule. His removal from the schedule was directly related to his unacceptable behavior in dealing with a patient and his family. Plaintiff must prove that competition in the market was injured. Here there was no injury to the market. Plaintiff is but one of many physicians in the market area that can provide services.

Finally in balancing the restraint, in this case, removal from the on-call trauma schedule, with the need to provide services to patients in a calm, non-confrontational environment, Defendants clearly can show justification for their actions.

Plaintiff argues that within the Rule of Reason Analysis, a "quick look" analysis is appropriate. This analysis provides that an observer with a rudimentary understanding of

-15- UMC\Tate\Pleadings\Opp to Plaintiff's Motion For Partial Summary Judgment

JIMMERSON HANSEN, P.C.
415 South Sixth Street, Suite 100, Las Vegas, Nevada 89101
Telephone (702) 388-7171 · Facsimile (702) 387-1167

economics could conclude that arrangements in question, have an anticompetitive effect on consumers or markets" (Citing: California Dental Ass'n v. FTC, 526 U.S. 756, 119 S.Ct. 1604 (1999)). Plaintiff makes this argument in an effort avoid the balancing the restraint with the justification. Again, the argument fails because even a "quick look" at the facts in this case show that incidental restraint on trade was justifiable.

### 2) Section 2 of Sherman Anti Trust Act

Plaintiff alleges a Violation of Section 2 Of the Sherman Antitrust Act. Violation of Section 2 of the Act, as outlined by Plaintiff, requires:

i) that a Defendant possess monopoly power in the relevant market and;
ii) the wilfull acquisition or maintenance of that power, as distinguished from growth or development as a consequence of superior product, business acumen or historic accident. United States v. Grinnell, 384 U.S. 563, 570-571, 86 S.Ct 1698, 1704 (1996).

More simply put, to prevail on a monopolization claim, Plaintiff must show that Defendants possessed monopoly power in a relevant market, willfully acquired or maintained that power and caused anti-trust injury. Bhan, 699 F. Supp. at 1022. Plaintiff argues that Defendants have a monopoly on the market. As stated above, although they have the only Level I trauma center in Las Vegas, they are by no means the only trauma center or hospital in Las Vegas. Therefore, UMC does not have a monopoly on trauma services. Further, the Plaintiff has not shown that Defendants' action had the intent in creating or maintaining a monopoly. A Level I trauma center distinction does not create a monopoly- it means the hospital engages in additional research. Further, Plaintiff has not shown an injury to the market. As stated above, injury to Dr. Tate does not equate to injury to the market. For these reasons, Plaintiff has not met the necessary standards and is therefore not entitled to summary judgment on this issue.

### C. DEFENDANTS WERE NOT NEGLIGENT

In a negligence action, the plaintiff has the burden of demonstrating the following: 1) that the defendant had a duty to exercise care with respect to the plaintiff, 2) that the defendant breached this duty; 3) that the breach was both the actual and proximate cause

-16- UMC\Tate\Pleadings\Opp to Plaintiff's Motion For Partial Summary Judgment

of the plaintiff's injury, and 4) that the plaintiff was damaged. Joynt v. California Hotel & Casino, 108 Nev. 539, 835 P.2d 799 (1992).

Plaintiff's argument for negligence fails on the very first element, duty. As stated above, Defendant's had no duty to give Plaintiff a hearing upon removal from the on-call trauma schedule. Without a duty, there can be no breach.

Further, questions of negligence and proximate cause are most often questions of fact, and are therefore, not subject to summary judgment. See: Perez v. Las Vegas Medical Ctr., 107 Nev 1, 805 P.2d 589 (1991).

### D. DEFENDANTS DID NOT BREACH AN IMPLIED DUTY OF GOOD FAITH AND FAIR DEALING

Plaintiff claims that Defendants violated their duty of good faith and fair dealing, by not affording a hearing to Plaintiff upon being removed from the trauma on-call schedule. As stated above, Defendants did not violate a duty to give Plaintiff a fair hearing because the parties agreement did not provide for a hearing upon removal from the on-call trauma schedule. Further, "good faith is a question of fact." Consolidated Generator-Nevada, Inc. v. Cummins Engine Co., 114 Nev. 1304, 1312, 971 P.2d 1251, 1256 (1998); See also: Mitchell v. Bailey & Selover, Inc., 96 Nev. 147, 150, 605 P.2d 1138, 1139 (1980). For these reasons, Plaintiff is not entitled to summary judgment.

### III.

### CONCLUSION

Plaintiff claims that Defendants violated Plaintiff's due process rights by not affording him a hearing upon being removed from the on-call trauma schedule. However, Plaintiff did not have a protected right in access to the on-call trauma schedule. Access to the on-call trauma schedule is not the same as medical staff privileges for surgery or the hospital. Plaintiff's arguments to the contrary must fail. Plaintiff also cannot show that a protected interest has been created by an express or implied contract. Even if there was a contract between the parties, Ms. Silver had every right to terminate such a contract under the circumstances.

-17 UMC\Tate\Pleadings\Opp to Plaintiff's Motion For Partial Summary Judgment

Plaintiff's claims of anti-trust violation, also fail as Plaintiff cannot show any restraint on commerce, or if there was a restraint, that it was unreasonable. Further, Plaintiff cannot show that UMC has a monopoly on trauma services, because there is another trauma center in the Las Vegas area that provides the same services. Similarly, Plaintiff cannot show intent to create or maintain a monopoly over such services or that the market has been injured by the decision to remove him from the trauma on-call schedule.

Plaintiff cannot show that Defendants were negligent in their actions since they owed no duty to provide him with a hearing under the circumstances. Further, the action of the Defendants were reasonable under the circumstances. Plaintiff's claim of breach of duty of good faith and fair dealing also fails because Defendants acted in good faith in dealing with the Plaintiff, which presents an issue of fact. These torts are based upon the facts, not the law and therefore are not proper for disposition by Summary Judgment. For these reasons, Plaintiff's Motion For Partial Summary Judgment should be denied.

DATED this 19th day of June, 2009.

JIMMERSON HANSEN, P.C.

/s/ Lynn M. Hansen

LYNN M. HANSEN, ESQ.
Nevada Bar No. 0244
415 S. Sixth Street, Suite 100
Las Vegas, Nevada 89101
Attorneys for Defendants
UNIVERSITY MEDICAL CENTER OF SOUTHERN NEVADA; KATHLEEN SILVER; BRUCE L. WOODBURY, TOM COLLINS, CHIP MAXFIELD, LAWRENCE WEEKLY, CHRIS GIUNCHIGLIANI, SUSAN BRAGER and RORY REID, Clark County Commissioners; ex-officio, the Board of Trustees of UNIVERSITY MEDICAL CENTER OF SOUTHERN NEVADA

# CERTIFICATE OF SERVICE

I hereby certify that I am an employee of JIMMERSON HANSEN, P.C., and that on the _19_ day of June, 2009, I served a true and correct copy of the document described herein by the method indicated below, and addressed to the following:

**Document Served:**

**DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

**Persons Served via electronic transmission:**

Jacob L. Hafter, Esq.
Law offices of Jacob L. Hafter, P.C.
2620 Regatta Drive, Suite 102
Las Vegas, Nevada 89128
*Attorneys for Plaintiff*

Thomas G. Ryan, Esq.
Lisa Wong Lackland, Esq.
LEWIS AND ROCA
3993 Howard Hughes Pkwy
Suite 600
Las Vegas, Nevada 89169
*Attorneys for Defendants
The Medical and Dental Staff of the
University Medical Center of Southern
Nevada, John Ellerton, M.D., and John
Fildes, M.D.*

**Served via U.S. Mail:**

Stephanie Barker, Esq
500 S. Grand Central Parkway
5th Floor
P. O. Box 552215
Las Vegas, Nevada 89155-2215
FAX: 382-5178
*Attorney for
Commissioner Rory Reid*

An employee of JIMMERSON HANSEN, P.C

-19-

UMC\Tate\Pleadings\Opp to Plaintiff's Motion For Partial Summary Judgment